UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
JAVAUGHN HIGGINS,

        Petitioner,

   -against-

JOHN COLVIN,

        Respondent.
----------------------------------------------------------x

**MEMORANDUM & ORDER**

16 CV 1717 (RJD)

DEARIE, District Judge.

Before the Court is the application of petitioner Javaughn Higgins for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

At approximately 8 p.m. on May 6, 2005, petitioner, then sixteen years of age, along with codefendants Devon Adams, Mirahab Joseph and other unapprehended teenagers, assaulted and robbed a middle-aged man, Mofizur Rahaman, on a Brooklyn street. Rahaman later died from brain injuries suffered when his head hit the pavement at some point during the attack. Petitioner was charged with robbery in the first and second degree and murder in the second degree (felony murder).[1]

Important evidence at petitioner's trial in Kings County Supreme Court were the highly particularized narratives in petitioner's written and videotaped post-arrest statements and testimony from three prosecution witnesses corroborating distinctive features of petitioner's account. The jury convicted petitioner of the two robbery counts but acquitted him of murder,

---

[1] Petitioner was also charged with criminal possession of stolen property in the fifth degree, and criminal possession of a weapon in the fourth degree but these counts were not submitted to the jury.

and the court sentenced him to concurrent terms of fifteen and ten years, plus five years' post-release supervision.[2]

The principal habeas claim is that petitioner's confession was not sufficiently corroborated by independent evidence as required by New York's confession corroboration rule, Criminal Procedure Law § 60.50. Relatedly, petitioner claims that the trial court failed to instruct the jury on the confession corroboration requirement, and that counsel was ineffective both because he failed to move to dismiss on the ground of lack of corroboration and because he failed to request a corroboration instruction. Finally, petitioner also claims that his Mirandized statements were not voluntary and that his sentence, within the lawful range, is nevertheless excessive.

Petitioner raised each of these claims either on his direct appeal or in a state post-conviction proceeding, and in each case the state court rejected the claim. As discussed below, petitioner has not met the formidable burden required to disturb these state court rulings. Accordingly, the application for habeas relief is denied and the petition is dismissed.

## RELEVANT TRIAL EVIDENCE

The prosecution touted petitioner's written and videotaped statements as "the best piece of direct evidence linking him to this case" (T 583).[3] The written statement was read to the jury by Detective James Gaynor, who assisted lead Detective Vincent Stropoli in the investigation

---

[2] Codefendant Devon Adams pled guilty before trial to robbery in the second degree and was sentenced to five years; co-defendant Mirahab Joseph, tried separately, was convicted of criminal possession of stolen property in the fifth degree and sentenced to one year in prison.

[3] "T," "HT" and "ST" refer, respectively, to pages in the transcript of the trial, suppression hearing, and sentencing proceedings

and interrogation. (T 494-96). It states as follows:

> Kyle, Arthur, Booby, Jamel, Joseph, Jason and me was on 21st Street. We said we were going on a vic, meaning rob somebody. So, we were walking on Church, and I picked up some batteries for the stun gun. We went through the back blocks and we ended up over there by the cemetery. We saw two white kids by the gas station. I asked them the time to see if they had a cell phone that was really valuable, and they didn't have it. So they went into the gas station. We went around the corner, saw an Indian dude.[4] Kyle ran up to him and hit him. I came up to him and went through his pockets. He tried to get up, Jason hit him, then I tasered him. I found cigarettes, Bible, MetroCard. I took the MetroCard. When a white guy came out of his house and started making noise, then everyone started to run. We ran like eight, ten blocks. Then I saw Joseph and Arthur with the phone ordering music on the phone.[5] Then we split up when we heard the police sirens. Me, Booby, Jamel, Jason and Arthur went one way and Kyle and Joseph went the other way. When I tasered him in the neck, I needed some money, so that's why we went out to go rob someone. I didn't mean for him to die. I'm sorry for my wrongdoings.

Corroborative testimony came, in part, from prosecution witness Jonathan Judice, an 18-year-old college student. Judice testified that at approximately 8:00 p.m. on May 6, 2005—*i.e.*, at approximately the same time as the events described in petitioner's statement—he was with his friend Scott Mesa, leaving McDonald's and walking down Fort Hamilton Parkway, towards Chester Avenue. The pair was heading to the Amoco gas station to get a drink when "a whole bunch of kids" stopped them and asked what time it was. (T. 331). Judice testified that because he already knew what time it was when he left McDonald's, "[he] just added another five or ten

---

[4] Ruhul Amin, the victim's friend and roommate, testified that Rahaman was a middle-aged man from Bangladesh. (T. 395-96).

[5] "[T]he phone" is apparently a reference to the victim's cellphone. This Court has not been furnished with a copy of the video statement, also introduced into evidence and played for the jury (T 367); according to respondent's brief, however, in the videotaped statement petitioner adds that an individual named "Cal" (arguably the "Kyle" in the written statement) took Rahaman's cellphone and gave it to Mirahab Joseph, who may have sold it later that night.

minutes." (T. 331). But the group of kids "asked [him] to check [his] cellphone." Judice replied that he did not have one and "turned around and walked right into" the Amoco store with his friend. (T. 333). Judice had never seen any of the "kids" before and did not make identifications of petitioner or of any of the codefendants.

Judice and Mesa were in the Amoco store for "[p]robably like two or three minutes" and when they came out, after walking for no longer than approximately a minute (T. 338), they saw the same bunch of kids who had approached them now running on Chester Avenue toward 12th Avenue, and also noticed "an older man on the floor laying down." (T. 334). Judice did not know what had happened to the man. Judice continued to observe, however, for approximately the next 15 minutes. He saw people he recognized from the neighborhood (though he did not know their names) "trying to help" the man, by trying to hold him up. He saw people "trying to pick him up and he kept on falling." (T. 339). Judice left the scene when he saw an ambulance arrive.

At the conclusion of the direct and cross of Judice, the court inquired further, for clarification:

> Q. You initially said you saw a group of individuals that came up to you and asked you for the time and wanted to see your cell phone, right?
> A. Yes.
> Q. Again, later on that evening, you saw a group of people running away?
> A. Yes.
> Q. To the best of your knowledge, did they look like the same kids, the same people?
> A. Yes.
> Q. Did you recognize any clothing?... How do you know that?
> A. They had the same clothing on but I don't recognize what they were wearing like right now. (T 342).

Defense counsel then re-crossed Judice, as follows:

4

Q. You're not able to describe any article of clothing that these persons had on...?
A. No.

...

Q. You never gave [the police] any height descriptions?
A. No.
Q. Any weight descriptions?
A. No.

...

Q. [These individuals] approached you from behind when you first saw them..?
A. Yes.
Q. And...you didn't turn around and stare at them?
A. That is correct.
Q. At the time when you saw them running, again, they were running away from you...?
A. Yes.
Q. And, yet, you could say it was the same group?
A. Yes. (T 343-44)

The state also called Rasheeda Dennis, who described herself as a good friend of codefendant Miharab Joseph with whom she spoke daily by telephone. Dennis testified that sometime between 8 and 9 pm on the night of the robbery someone called her home asking for her; she was at work but her mother took the call. Telephone records admitted into evidence without objection established that Rahaman's cellphone was used to call Dennis's home phone at that time. (T 388-89). Testimony from Ruhul Amin, Rahaman's roommate and friend, confirmed Rahaman's cell number. (T 398-99).

Rahaman died twelve days later, on May 18, 2005, from head injuries sustained during the May 6 incident. Relevant here, the medical examiner could not determine whether the head injury had been sustained by falling (accident) or because he was pushed. (T 416-17; T 425-26; T 454-55). The autopsy also revealed cirrhosis of the liver, although Rahaman's blood alcohol level was not tested, but defense argued in summation that Rahman might have fallen because of

drunkenness.⁶

## DISCUSSION

### GENERAL HABEAS STANDARDS

Habeas relief is authorized "only on the ground that [an individual] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Review of these federal claims is highly deferential to the state courts. As the habeas statute provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(1), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA").

This statute "erects a formidable barrier to federal habeas relief," Burt v. Titlow, 571 U.S. 12, 19 (2013), because it embodies "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights . . . and are thus presumptively competent [ ] to adjudicate claims arising under the laws of the United States." Id. at 19. Federal habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Id. at 16 (internal quotations, citations and alterations omitted). See also Virginia v. Le Blanc, 137 S. Ct.

---

⁶ Of additional note: Police Officer Danielle Roventini, who first responded to the scene, did not record any notes in her memo book regarding the case, and as a result was investigated by Internal Affairs. The state's brief here reports that that investigation was still pending at the time of trial.

6

1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted); but see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief.") (internal quotation marks, citation and alterations omitted).

In short, the "contrary to or unreasonable application" standard codified by AEDPA "means that a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Shoop v. Hill, 139 S. Ct. 504, 507 (internal quotations and citations omitted). Accord Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation and citation omitted).

## ANALYSIS OF PETITIONER'S CLAIMS

### 1. The Confession-Corroboration Claim

Petitioner's challenge to the sufficiency of the evidence corroborating his confession as required by C.P.L. § 60.50 does not present a basis for habeas relief.

He raised this claim on direct appeal and the Appellate Division rejected it as "unpreserved for appellate review," citing New York's contemporaneous objection rule, C.P.L. § 470.05. People v. Higgins, 123 A.D.3d 1143, 1143-44 (2d Dep't 2014), lv. app. denied, 25 N.Y.3d 1073 (2015). The claim, therefore, is barred from review here by the independent and adequate state law doctrine. See generally Davila v. Davis, 137 S. Ct. 2058, 2064 (2017);

7

Coleman v. Thompson, 501 U.S. 722, 729 (1991). A state procedural bar "is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the specific circumstances presented." Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), cert. denied, 552 U.S. 1150 (2008) (quoting, Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)). The requirement that an issue be preserved by contemporaneous objection as required by NY CPL § 470.05(2) is a firmly established and regularly followed rule for these purposes. Richardson v. Greene, 497 F. 3d 212, 217-18 (2d Cir. 2007); Petronio v. Walsh, 736 F. Supp. 2d 640, 653 (E.D.N.Y. 2010). This bar applies "even where," as here, "the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); see also Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original).

The bar erected by the independent and adequate state law doctrine may be lifted only if a petitioner demonstrates either "cause" for failing to comply with the state rule and "actual prejudice" if the claim is not reached, or that a lack of federal review will result in a fundamental miscarriage of justice because he is actually innocent. Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 87 (1977). Petitioner has not formally addressed this feature of his claim.

Even if petitioner's separate claim that trial counsel was ineffective for failing to handle the corroboration question properly is liberally construed as an attempt to show cause for purposes of this claim, nevertheless the procedural bar would remain because petitioner would have to also show prejudice, *i.e.*, that the claim has merit, and this he cannot do. The Appellate Division, in its alternative merits ruling, held that petitioner's confession "was sufficiently

8

corroborated by independent evidence." Higgins, 123 A.D.3d at 1144. Petitioner cannot show that this ruling is contrary to or an unreasonable application of Supreme Court law.

First, as a general matter, state evidentiary rules such as the confession corroboration requirement embodied in C.P.L. § 60.50 do not trigger federal constitutional concerns. See, e.g., Gonzalez v. Lee, 2017 WL 3600406, at *9 (E.D.N.Y. Aug. 17, 2017) ("New York's confession corroboration rule . . . embodies no federal constitutional principles" (internal quotation and citation omitted), app. dismissed, 2018 WL 144858 (2d Cir. Mar. 13, 2018). Claimed violations of that requirement, therefore, would not be cognizable on habeas. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

In any event, the Appellate Division's ruling appears to be correct under New York law. Criminal Procedure Law § 60.50 provides that, "[a] person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed." The requirement is "minimal." People v. Groff, 71 N.Y.2d 101 (1987). As the New York Court of Appeals has held:

> This statutory corroboration requirement does not mandate submission of independent evidence of every component of the crime charged ... but instead calls for some proof, of whatever weight, that a crime was committed by someone. The purpose of the statute is to avert the danger that a crime may have been confessed when no crime in any degree has been committed by anyone.

People v. Chico, 90 N.Y.2d 585, 589 (1997) (internal quotations and citations omitted).

There can be no serious dispute that the crime to which petitioner confessed was in fact committed, and that the evidence admitted through Jonathan Judice, Rasheeda Davis and Ruhul Amin (as reviewed above) provides the requisite corroboration. It hardly need be spelled out:

9

Judice's narrative substantiates the opening portion of petitioner's account about the "two white kids by the gas station" who were asked for the time as a ruse to produce their cellphones, while the evidence of a call made from the victim's cellphone to codefendant Joseph's friend substantiates the theft of that apparatus as admitted in petitioner's video statement.[7]

## 2. The Trial Court's Failure to Instruct the Jury on the Confession-Corroboration Requirement

Petitioner's related claim, that the failure to instruct the jury in accordance with C.P.L. § 60.50 deprived him of a fair trial, likewise fails to present a basis for habeas relief

First, the Appellate Division found this claim, like the corroboration claim, unpreserved for appellate review—here, because counsel did not request the instruction. Higgins, 123 A.D.3d at 1144. This claim, therefore, is procedurally barred for the reasons already discussed in the context of the corroboration claim.

Making whatever procedural assumptions might be necessary to render the claim cognizable on the merits, the Court would nevertheless conclude that the claim is without merit. The Appellate Division, ruling on the merits of the claim in the alternative, held that "the absence of a charge in accordance with CPL 60.50 did not deprive [petitioner] of a fair trial" because his confession "was sufficiently supported by independent corroborative evidence that

---

[7] The fact that under New York law the state must satisfy the corroboration requirement in order to establish a legally sufficient case does not convert this state-law claim into a federal "sufficiency" claim—but even assuming arguendo that federal sufficiency standards were implicated, they are plainly satisfied here. See generally Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Simply put, a rational juror could well draw the connections just delineated between petitioner's statement and both Judice's account and the evidence of the use of the victim's cellphone.

10

the offenses of which [he] was convicted were committed." Id. This ruling was not contrary to or an unreasonable application of controlling Supreme Court authority. See generally Cupp v. Naughten, 414 U.S. 141, 146 (1973) ("Before a court may overturn a conviction" because of jury instruction error, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."); Estelle v. McGuire, 502 U.S. 62, 72 (1991) (fair-trial inquiry is whether alleged error "so infected the entire trial that the resulting conviction violates due process") (internal quotation and citation omitted); Dowling v. United States, 493 U.S. 342, 352 (1990) (due process/fair trial inquiry is whether alleged error is "so extremely unfair" that it "violates fundamental conceptions of justice") (internal quotation and citation omitted).

In sum, the Appellate Division's determination that petitioner's trial was fair is not an unreasonable application within the meaning of AEDPA of these standards.

3. **The Ineffective Assistance of Counsel Claim.**

In light of the foregoing analyses, petitioner's ineffective assistance of counsel claim requires little discussion.

As noted, petitioner claims that counsel was ineffective because he failed to move to dismiss on the ground of lack of corroboration evidence and because he failed to request a confession-corroboration charge in accordance with C.P.L. § 60.50. The Appellate Division reached and rejected this exact claim on the merits, holding that counsel's failure to address corroboration in the two ways cited by petitioner "did not constitute ineffective assistance." Higgins, 123 A.D. 3d at 1144. To prevail, petitioner would have to show that the Appellate division's ruling reflects an unreasonable application of the controlling Supreme Court authority.

11

This petitioner cannot do.

Under the familiar standard announced in Strickland v. Washington, 466 U.S. 668 (1984), a petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688, 694. Further, "[a] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." Id. at 670. Finally, where the state court has already rejected an ineffectiveness claim, the standard on habeas is one of double-deference. See, e.g., Harrington v. Richter, 562 U.S. 86, 105 (2011) ("[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult [because] [t]he standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so") (internal quotation and citation omitted).

In its treatment of petitioner's first two claims, this Court has concluded that there was no reason to disturb the Appellate Division determinations that there was sufficient independent evidence corroborating petitioner's confession and that the trial court's failure to instruct on confession-corroboration did not deny petitioner a fair trial. For purposes of the ineffectiveness claim, these same two discussions dispose of the prejudice branch of the Strickland test. Petitioner's ineffectiveness claim therefore does not present a basis for habeas relief.

4. **Voluntariness**

In claiming that his statements were not voluntarily made, petitioner advances a single contention: the detective who testified at the suppression hearing expressed uncertainty over who

wrote the word "yes" and petitioner's initials on the Miranda waiver form. That fact, coupled with the state's failure to call the other detective who participated in the interrogation once the uncertainty arose, petitioner says, renders his statements involuntary. Petitioner makes no claim of coercion, mistreatment or intimidation, nor does anything in the hearing record remotely suggest a basis for such a claim.

Petitioner's limited voluntariness challenge is plainly not a basis for habeas relief.

At the suppression hearing, lead Detective Stropoli testified, in relevant part, that he administered the Miranda warnings to petitioner following the script on the pre-printed Miranda form, and that after reading each right and asking petitioner if he understood, petitioner both replied yes orally and confirmed yes by initialing the form next to the word yes. See, e.g. H. Tr. at 9 (Stropoli testified that "[Petitioner] replied yes. Next to that is his initials second yes [sic]."). Stropoli further specified that it was he who filled in certain items (names, times) on the form and that it was his signature on the bottom of the form. The court then asked: "Who wrote the yes." (HT 9). The following ensued:

> A. I believe that would be his [petitioner's] handwriting.
> Q. Is it your handwriting?
> A. No that's not my handwriting. I would think it's his handwriting. It's his initials next to the yes.
> Q. When you asked him to write yes and his initials was it at the end of each question?
> A. This is at the end of everything. (HT 9)

Once Stropoli had finished reading petitioner his rights individually and asking if he understood them, he asked petitioner if he was willing to answer questions and petitioner replied yes. (HT 10). Petitioner was asked to sign the waiver and did; Stropoli stated that petitioner's signature was "on top" of the form and that he and Detective Gaynor also both signed the form. (HT 10).

13

On cross-examination, Stropoli stated again that the yes and initials were not in his handwriting; whereas on direct he stated that he "believe[d]" the yes and initials were in petitioner's handwriting, on cross he stated that he "assume[d]" it was petitioner's. (HT 24). That prompted the court to inquire: "could it be Gaynor," referring to the other detective participating in the interrogation. Stropoli testified that he did not know Gaynor's handwriting, the court asked, "but it could be," and Stropoli replied, "It could be yes." (HT 25). Defense counsel also elicited that Stropoli "possibl[y] .. walked out and came back in" while petitioner was writing out his statement. (HT 25).

The hearing court, which had the advantage of observing in person the testimony of Detective Stropoli, and which also viewed petitioner's written statement, videotaped statement, and the Miranda form in question, concluded that it "c[ould] see no grounds for suppression." (HT 31). Relevant here, the hearing court found that, as for "[t]he statement[s], there is no reason to believe they were coerced [ ] or that he didn't wasn't [sic] given his rights appropriately or that he didn't understand it and the statement on the video was done as a matter of fact, no sign that he was frightened or coerced."[8] (HT 31).

Petitioner raised on direct appeal the same contention he makes here, and the Appellate Division held that "th[at] specific argument ...is unpreserved for appellate review." Higgins, 123 A.D.3d at 1143. Accordingly, the claim is procedurally barred from review on habeas by the independent and adequate state law doctrine under the authorities already reviewed.

Even with the benefit of the procedural assumptions necessary to render the claim

---

[8] The hearing court also found that there was probable cause to arrest petitioner based on information provided by an earlier-apprehended codefendant.

14

cognizable, the claim would still fail on the merits. The Appellate Division, in its alternative substantive ruling, held that petitioner's challenge to the voluntariness of his statements "is without merit" and that "the Supreme Court properly denied that branch of [petitioner's] omnibus motion which was to suppress his statements to law enforcement officials." Higgins, 123 A.D.3d at 1143. This ruling was not "an unreasonable determination of the facts in light of the evidence presented" within the meaning of 28 U.S.C. § 2254(d)(2).

Of note, Stropoli testified that, independent of the uncertainty about who wrote yes and petitioner's initials, petitioner did orally acknowledge that he understood the rights he was waiving. It was not unreasonable for the Appellate Division, in ruling that the hearing court properly denied suppression, to have decided that it was proper for the hearing court to credit Stropoli's testimony in light of the hearing record as a whole. Stropoli's uncertainty about who wrote yes and petitioner's initials clearly did not prevent the court from finding Stropoli credible; indeed, Stropoli's open concession of that uncertainty could reasonably have bolstered his overall credibility.[9] And Stropoli, as noted, testified that petitioner both "said" yes and then confirmed that "yes" with his initials: any uncertainty about who wrote those initials, standing alone, does not establish that petitioner's statements were involuntary.

---

[9] Further still: testimony at trial reveals the claim to be a red-herring. At trial, it was Detective Gaynor rather than Detective Stropoli who was called to testify to the administration and waiver of petitioner's rights and the making of his statement. (T. 485-532). In relevant part, Gaynor testified both that, when asked whether he understood each of his rights petitioner "responded: 'yes'" (T 492), and also that it was petitioner who "marked each response that he put 'yes' [sic] with his initials and then signed the form." (T. 493).

15

## 5. Sentencing Claim

In challenging his sentence as excessive, petitioner argues, principally, that he was wrongly denied youthful offender status under C.P.L. § 720.20. He also argues that his sentence is harsh for a first-offender and that its length is disproportionate to the shorter terms imposed on his codefendants. These assertions, individually or combined, do not present a basis for habeas relief.

The maximum sentence under New York law for robbery in the first degree is 25 years, see P.L. §§ 160.15, 70.02(2)(b), and for robbery in the second degree, 15 years. See P.L. §§ 160.10, 70.02(2)(c). Because petitioner's sentences of 15 years for first-degree robbery and 10 years for second-degree are within the lawful range under state law, a length-of-sentence challenge does not present a constitutional issue cognizable on habeas. See Hernandez v. Unger, 2019 WL 7283514, at *9 (E.D.N.Y. Dec. 27, 2019) ("It is well settled that when a sentence is in accord with the range established by state statutory law there is no constitutional issue presented for habeas review") (internal quotation and citation omitted).

Additionally, even if the court were authorized to examine the sentence further, it would find no basis for habeas relief. Petitioner advanced a general claim of excessiveness on direct appeal, and the Appellate Division held that "the sentence imposed was not excessive." Higgins, 123 A.D.3d at 1144. That ruling, based on state law, does not present a federal question reviewable here. See Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Petitioner raised his youthful-offender-status claim in a post-conviction motion to set

aside the sentence pursuant to C.P.L. § 440.20(1), and the court rejected that claim on the merits. People v. Higgins, Ind. No. 7986-2005 (Dec. & Order Oct. 8, 2015).[10] This decision, likewise, is based entirely on state law and therefore not reviewable here. Gomez v. Connell, 2011 WL 5825780, at * 3 (E.D.N.Y. Nov. 7, 2011) ("even construed liberally, the state court's application of the youthful offender statute does not implicate a federal or constitutional question").

Even if the youthful offender claim were reviewable, the only question of law it presents was decided correctly. New York's youthful offender statute provides, in pertinent part, that "[u]pon conviction of an eligible youth...at the time of pronouncing sentence the court *must* determine whether or not the eligible youth is a youthful offender." CPL § 720.20(1) (emphasis added). The statutory criterion is whether "in the opinion of the court the interest of justice would be served by relieving the eligible youth from the onus of a criminal record," and the statute further provides that the ultimate determination is a matter of the court's "discretion." Id. Petitioner also points to a New York Court of Appeals decision issued in 2013, seven years after sentence was imposed in his case, People v. Rudolph, 21 N.Y.3d 497 (2013), which held that the word "must" in the statute means that "compliance with th[e] statutory command cannot be dispensed with even where defendant has failed to ask to be treated as a youthful offender." Id. at 500.

As the 440.20 decision correctly states, the sentencing court complied with the statutory mandate and Rudolph in that it did *consider* youthful offender status. At the court stated at the sentencing proceeding:

---

[10] The claim is exhausted: petitioner sought leave to appeal denial of his 440.20 motion, which was denied by order of the Appellate Division dated March 18, 2016.

17

This robbery was planned. It wasn't a spur of the moment thing. And from my review of all the factors that I'm aware of in your background, *I have considered youthful offender treatment*. Youthful offender treatment is given to individuals who commit what we call an aberrant act, a mistake, a lapse in judgment, and society indicates that you shouldn't be burdened with a felony conviction. But from your conduct and the manner in which the crime occurred, it is clear to this Court that that act was not an aberrant act, but it was planned, and I'm going to deny youthful offender treatment. (HT 11-12) (emphasis added).

The sentencing court's discretion in denying youthful offender status is not reviewable here.

## CONCLUSION

For all the reasons discussed, the application of petitioner Javaughn Higgins for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
March /& 2020

s/RJD
_____
RAYMOND J. DEARIE
United States District Judge